THERON CASTNER AND ANOTHER, *d. b. a.* C. & S. TOOL COMPANY, v. VICTOR CHRISTGAU.[1]

May 24, 1946.

No. 34,205.

[1]Reported in 24 N. W. (2d) 228.

*Oscar G. Haugland,* for appellants.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, and *George W. Olson,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Proceeding to determine the liability for unemployment contributions of Theron Castner and Harry Sadler, doing business as C. & S. Tool Company, appellants, on sums paid for services rendered their firm by Otis M. Larsen as hereinafter set forth.

On January 31, 1945, the referee for the division of employment and security determined that appellants were indebted to the state unemployment compensation fund in the sum of $137.02 on wages totaling $5,074.90 paid by them to said Larsen between July 1, 1942, and July 1, 1944. On May 18, 1945, the referee's decision was affirmed by the director of the division. A writ of certiorari issued by the district court of Hennepin county was served upon the director, and upon his return the matter was heard and determined by said court adversely to appellants. This appeal followed.

The sole question here is whether services performed by said Larsen for appellants between the dates specified constituted employment within the meaning of the employment and security act, particularly Minn. St. 1941, § 268.04, subd. 12(5), (Mason St. 1941 Supp. § 4337-22K[5]) thereof.

At the times involved, Otis M. Larsen, holding an engineer's degree and a master's degree, was employed as a full-time instructor at the University of Minnesota. Under such employment, he was permitted to do a limited amount of consultative work outside his scheduled hours at the University, and for some time had been engaged in such work for several concerns, including that of appellants. His work for them commenced shortly prior to July 1, 1942, at which time he entered into a written agreement with them, which in part provided:

"Whereas the undersigned, Otis M. Larsen, an instructor in the subject of mechanical engineering at the University of Minnesota is permitted by said employer to act as consulting engineer to various private firms and persons at times not conflicting with his said employment by said University, and

\* \* \* \* \*

"Now therefore it is agreed between the said parties as follows;
"1. If at times hereafter occurring the said C and S Tool Company needs and desires the services, knowledge and ability of said Otis M. Larsen in his capacity as consulting mechanical engineer and he so acts for said company he shall receive and the company

shall pay him the sum of $2.00 per each hour so devoted by said Otis M. Larsen to the Problems and business of the company.

"2. The said compensation shall be in full and complete payment of said services and in consideration thereof said Otis M. Larsen shall devote his best efforts, knowledge and skill to the company business and problems.

"3. Said Otis M. Larsen shall not be obligated hereby to render said services at any particular time nor for any extended period of time but shall endeavor to be available when needed and called for by the company.

"4. Neither shall the company be obligated to use the skill and knowledge of said Otis M. Larsen for any extended period or at any particular time.

"5. Said Otis M. Larsen reserves the right to work for other persons and firms in said same capacity and is not obligated to reserve his time and efforts outside of his said employment at said University for C and S Tool Company exclusively."

Thereafter, under said agreement, Larsen performed the services which are here questioned, as a consultant and, manually, as a planner and builder of various machines or tools required by appellants in their business. The work was done either in appellants' machine shop or in Larsen's home, where he maintained a fully equipped drafting room. Ordinarily, the services were rendered after consultations between Larsen and Sadler, and related to plans, specifications, and equipment necessary to construct and complete machine tools devised or proposed by Sadler. Under the agreement, no regular hourly schedule was required, and either of the parties could terminate the relationship at any time. In practice, after the work was completed, Larsen would bill appellants at the rate of two dollars per hour for the actual time he had expended on their behalf. He was authorized to, and from time to time did, employ others to assist him in such work. The assistants were likewise paid by appellants.

It is appellants' contention that Larsen was not an employe in the master-and-servant sense, but, rather, that the services rendered

by him were those of a consulting engineer or professional man, for which there attached no responsibility for contributions under the act.

■ Section 268.04, subd. 12(1, 5), (§ 4337-22K[1, 5]), in effect at the times here involved, provided as follows:

"(1) Subject to the other provisions of this subdivision 'employment' means service performed prior to January 1, 1940, which was employment as defined in this section prior to such date, and any service performed after December 31, 1939, including service in interstate commerce and service as an officer of a corporation performed for wages or under any contract of hire, written or oral, express or implied, where the relationship of master and servant exists;"

"(5) Services performed by an individual for wages shall be deemed to be 'employment' subject to sections 268.03 to 268.24 unless and until it is shown to the satisfaction of the director that the relationship of master and servant does not exist, as specified in clause (1) hereof or (a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and (b) such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (c) such individual is customarily engaged in an independently established trade, occupation, profession or business;"

Careful examination of said provisions creates doubt as to whether the legislature in passing the aforesaid sections intended to adopt the common-law conception of master and servant with the added restrictions provided in clauses (a), (b), and (c)—the so-called ABC test—or whether the common-law definition of master and servant was intended to be entirely displaced by the definition set forth within said clauses (a), (b), and (c). In Rochester Dairy Co. v. Christgau, 217 Minn. 460, 14 N. W. (2d) 780, however, it

appears that any doubt on this question was settled when we held that, where the relationship of master and servant was shown not to exist, the ABC test did not become material. In other words, we held there that if, in the performance of services or employment, the evidence establishes that a master-and-servant relationship does not exist, then such services do not come within the provisions of the act, although they might otherwise fall within the tests set forth in clauses (a), (b), and (c).[2] Accordingly, the issue here is limited to a determination of whether the common-law relationship of master and servant existed between Larsen and appellants.

■ In Restatement, Agency, § 220, the rules governing this question are set forth as follows:

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) *the extent of control* which, by the agreement, the master may exercise over the *details* of the work;

"(b) whether or not the one employed is engaged in a *distinct* occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a *specialist without supervision;*

"(d) the *skill* required in the particular occupation;

"(e) whether the employer or the workman supplies the *instrumentalities,* tools and the *place* of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

---

[2] It may be noted that the legislature at the 1945 session, by c. 376, revised § 268.04, subd. 12, by eliminating therefrom the so-called ABC test and by providing simply that "employment" means any service performed by an individual who is a servant under the law of master and servant, or who performs services for any employing unit unless such services are in pursuit of his individual, independently established business, or unless he is in fact an independent contractor.

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the *parties believe* they are creating the relationship of master and servant." (Italics supplied.)

In determining this issue, the law is well settled that all of the foregoing factors must be considered together and that no general rule can be laid down which will cover all situations. The test which is most emphasized in the determination of this question is the *right* of control. In substance, we have stated that, if the will of the person for whom the services are performed controls merely as to the *result* to be obtained, but not as to the *means of obtaining such result,* the person doing the work does not come within the master-and-servant doctrine. See, Herron v. Coolsaet Bros. 158 Minn. 522, 198 N. W. 134; Moore v. Kileen & Gillis, 171 Minn. 15, 213 N. W. 49; Waters v. Pioneer Fuel Co. 52 Minn. 474, 55 N. W. 52, 38 A. S. R. 564. In Korthuis v. Soderling & Sons, 218 Minn. 342, 346, 16 N. W. (2d) 285, 287, we stated this rule as follows:

"The difficult question to determine is whether, from the evidence, relator had the right of control necessary to establish the employment relationship, *i. e.,* 'the right of the employer to control the *means* and *manner* of performance.' * * * This * * * control by the employer over the employe is necessary to establish this relationship." (Italics supplied.)

■ Keeping in mind the foregoing tests and decisions and applying the rules thereby established to the facts in the instant case, we are compelled to conclude that there are several matters in evidence which give rise to substantial doubt that the relationship of master and servant covered the situation between Larsen and appellants. It is to be noted that at all times Larsen was in full-time employment at the University, where he spent the greatest portion of his working hours; that he rendered similar consulting services for other firms while retained by appellants; that he did his work for appellants either at his own home or at their shop, whichever was more convenient, and that *his* determination of this factor was

final; that he worked entirely without supervision, although consulting at times with appellant Sadler; that he was instructed to do the work in any way he desired, employing such assistants as he required, and to determine the actual hours necessary to complete performance of his assignments; that he worked only when his university schedule permitted and that this oftentimes prevented his working for appellants for months at a time. There is nothing to indicate that appellants had the right to direct or control the manner of the performance of his work or supervise it in any way. The record indicates that he was employed to do a specified piece of work according to his own methods and was subject to control only as to the end results.

His services were those of a skilled and trained consultant. Both parties to the contract regarded his employment as that of any professional man, such as a doctor, lawyer, or dentist, retained for a specific piece of work. In Hamrin v. Thompson Yards, Inc. 172 Minn. 536, 538, 216 N. W. 247, we stated:

"* * * Nor was Lauber [an attorney employed to do certain legal business] an employe for whose acts while driving his auto in making a collection or doing other legal business the defendant company was liable to a pedestrian injured through his negligence. He was not in its general employ. He was employed as an attorney in general practice is employed by a corporation. He was not under its specific direction when he went to St. Cloud. He could have gone by train or bus or he could have transacted the business by correspondence. Neither his method of transportation nor his method of doing the business in hand was directed by the corporation. He was as free in his choice of methods and time as an attorney generally is. He was an independent contractor, if that term be applicable in such a case as this. The corporation was not responsible because he was negligent in driving his auto."

Neither appellants nor Larsen regarded the latter as an employe. Appellants made no report on him to the division; they carried no compensation insurance on him and paid no contributions to the

old age federal tax. They withheld no victory tax or withholding tax from his salary. He was not required to carry public liability insurance on the automobile which he drove in connection with his work.

From the foregoing, it appears that under most of the tests in the Restatement and the authorities above set forth the relationship between appellants and Larsen did not fall within the common-law definition of master and servant; and that the services rendered by the latter were similar to those rendered by any professional man such as a consulting engineer, an attorney, a doctor, an accountant, or other individual employed or retained from time to time to perform some specialized service, and, as such, not subject to the terms and provisions of the act.

Reversed.